1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

CHRISTINE JOHNSON,

                     Plaintiff,

vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:07-cv-01509-PMP-PAL

**FINDINGS AND RECOMMENDATION**

(Motion for Reversal #20)
(Motion for Remand #25)
(Motion to Strike #28)

      This case involves judicial review of administrative action by the Commissioner of Social Security denying Plaintiff Christine Johnson's claim for disability benefits under Title II of the Social Security Act. Plaintiff's Complaint (Dkt. #1) was filed November 14, 2007. Defendant's Answer (Dkt. #15) was filed March 5, 2008, along with a certified copy of the administrative record.[1] This matter has been submitted to the undersigned United States Magistrate Judge for Findings and Recommendations on Johnson's Motion for Reversal (Dkt. #20) filed on May 7, 2008, and the Commissioner's Motion for Remand (Dkt. #25).

**BACKGROUND**

**I.    Procedural History.**

      On April 15, 2003, Johnson filed an application for Social Security Disability Insurance Benefits alleging she became disabled on October 25, 1998. (A.R. 30). Her claim was denied by the Social Security Administration (the "SSA"), and Johnson timely filed a request for a reconsideration hearing before an Administrative Law Judge ("ALJ") on March 29, 2005. (A.R. 29). The hearing before the Honorable Eve B. Godfrey, the ALJ, was held on June 13, 2006. The ALJ issued her decision on August 25, 2006, finding

---

      [1]Exhibit "A" attached to Defendant's Answer (Dkt. #15) is a certified copy of the entire administrative record in this matter. This Report and Recommendation will refer to Exhibit "A" as the Administrative Record ("A.R.").

Johnson met the non-disability requirements of Section 216(i) of the Social Security Act and was insured for disability benefits through March 31, 2004, but was not disabled within the meaning of the Act.  (A.R. 29, 30).  Johnson requested review of the ALJ's decision by the Appeals Council on October 4, 2006. (A.R. 10-11).  The Appeals Council denied review of the ALJ's decision on September 12, 2007, making the ALJ's decision the final decision of the Commissioner of Social Security (the "Commissioner").  (A.R. 5 - 9).

On November 14, 2007, Johnson filed a Complaint (Dkt. #1) in this court, appealing the decision of the Commissioner.  The Commissioner filed an Answer (Dkt. #15) to Plaintiff's Complaint on February 5, 2008.  A Scheduling Order (Dkt. #17) was entered on March 7, 2008.  Johnson filed a Motion for Reversal (Dkt. #20) on May 7, 2008, to which the Commissioner responded by filing a Motion to Voluntary [sic] Remand Pursuant to Sentence Four of 42 U.S.C. § 405(g) on July 22, 2008 (Dkt. #25).  On August 4, 2008, Johnson filed a Reply to Defendant's Motion for Remand (Dkt. #26).  On August 19, 2008, the Commissioner filed a Reply (Dkt. #27).  On August 27, 2008, Johnson filed a Motion to Strike the Motion to Remand (Dkt. #28). On September 25, 2008, the Commissioner filed a response to the Motion to Strike (Dkt. #29).  The Court has considered the Motion for Remand, the Motion for Reversal, Johnson's Response, the Commissioner's Response, the Motion to Strike, the Response to the Motion to Strike, and the Administrative Record below.

**II.    Facts and Medical Record Below.**

Christine Johnson was born on March 14, 1966, has a high school equivalency education, and is a certified diamontologist and gemologist. (A.R. 30). Johnson protectively filed an Application for Disability Insurance  Benefits  on  April 15, 2003  alleging  an  inability to  work  since  October 25, 1998  (A.R. 29).

///

///

///

///

///

///

///

-2-

Johnson alleges that she became disabled on October 25, 1998 as a result of a combination of medical impairments consisting of cervical disc disease status post fusion,[2] lumbar degenerative disease[3], status post right shoulder arthroscopic surgery[4], and an affective disorder[5].  (A.R. 30, 600).  Johnson has also been diagnosed with osteoarthritis, which has reduced her ability to walk or stand for any length of time.  (A.R. 159).  Johnson also suffers from chronic neck pain associated with the removal of a disc and fusion of the bones in her neck, nerve radiculopathy of the right arm, lower lumbar strain, chronic disc disease of the low back, a fractured coccyx, lower extremity swelling with chronic pain and numbness in the buttocks and legs and migraine headaches.  (A.R. 158 - 161).  As a result of these conditions, Johnson has been prescribed various medications since a May 5, 1994 automobile accident, including, among others, Lortab for lower back and spinal pain; Flexeril for stiffness, headaches, and muscle pain; Lexapro for depression; Percoset for pain; Restoril to sleep; and Actonel for treatment of bone loss due to osteoporosis.  (A.R. 154, 160).  She claims Flexeril and Percoset make her sleepy, groggy and unable to concentrate. (A.R. 124-125, 154).

Prior to her alleged disability, Johnson was employed as a retail store manager, a gate agent for an airline company, a reservations agent for an airline company, and a salesperson.  (A.R. 30).  Johnson has been unable to work a full day since August 1998, although she briefly attempted work as a child care monitor one day a week between 2000 and 2001.  (A.R. 125, 163).

---

[2]Cervical disc disease is characterized y a bulge or rupture of the disc material into the spinal canal, which causes abnormal pressure on the nerve at that level, leading to symptoms in the neck, arm, and/or hand.  See E-medicine by WebMD, http://emedicine.medscape.com/article/305720-overview (last visited February 26, 2010).

[3]Syndrome characterized by pain in the lower back, sometimes radiating into the hips and legs. See Spine-Health, http://www.spine-health.com/conditions/degenerative-disc-disease/lumbar-degenerative-disc-disease (last visited February 26, 2010).

[4]Minimally invasive surgical procedure used to visualize, diagnose, and treat torn rotator cuff. An orthopaedic surgeon makes a small incision in the patient's skin and then inserts pencil sized instruments containing a small lens and lighting system to magnify and illuminate the structures inside the shoulder joint.  See Hospital for Special Surgery, http://www.hss.edu/conditions_14160.asp (last visited February 26, 2010).

[5]A mental disorder characterized by dramatic changes or extremes of mood, including manic or depressive episodes, and often a combination of the two.  See Britannica, http://www.britannica.com/EBchecked/topic/7688/affective-disorder (last visited February 26, 2010).

A.     **Onset of Johnson's Alleged Disability.**

In May 5, 1994, Johnson was involved in an automobile accident, in which she was rear-ended by another vehicle. (A.R. 165, 166). Johnson's car was stopped, and she was wearing her seatbelt. (A.R. 170). Johnson was initially treated at the Lahey Clinic by John J. Foley, M.D. and diagnosed with acute cervical strain. (A.R. 170, 198). X-rays taken of the cervical spine were normal. (A.R. 198, 200). On June 30, 1994 an MRI examination of the cervical spine revealed a central right-sided disc herniation at the C5-6 level and material extending along the dorsal aspect of the lower to mid C5 vertebral body raising the possibility of a free disc fragment. The MRI was ordered by Dr. Fullerton, a neurologist who also prescribed a six-month course of physical therapy for Johnson. (A.R. 204). Johnson had two Electromyelograms ("EMGs"), the second of which was consistent with a C6 radiculopathy.[6] Id. An MRI of the cervical spine was performed October 27, 1994 which found a small midline disc protrusion with no cord compression noted at the C5-6 level and a slight right C5-6 foraminal asymmetry with no apparent nerve root compression. (A.R. 177). A cervical myelogram performed October 26, 1994 found a small central extradural defect at C5-6 without nerve root effacement. (A.R. 178). A post myelogram CT of the cervical spine performed October 26, 1994 found a small central and right paramedian disc bulge at C5-6 without spinal canal or nerve root compromise. (A.R. 179).

Johnson saw Dr. McCann, a neurosurgeon with the New England Neurological Associates October 12, 1994. Dr. McCann was referred to the plaintiff by Dr. Fischera. (A.R. 313). Dr. McCann's notes reflect that Dr. Fullerton and Johnson's physical therapist thought she should be considered for surgery in September.  At the time of the initial visit Johnson was taking Norflex, Flexeril and Motrin 800.  On physical examination Johnson did not appear in any acute distress but had tenderness over the inferior right cervical spine posteriorly as well as over the right supraclavicular fossa. (A.R. 314). Mild restriction and rotation of the neck to the right and pain going into the right shoulder and upper arm were observed when turning the neck to the right and extending the neck. Id. Range of motion through the right shoulder was normal. Dr. McCann's impression was "HNP, C5-6 with right C6 radiculopathy". Id. He opined that " the

---

[6] Nerve root damage resulting in pain that radiates from the neck and from around the shoulder into the arm and the forearm. See Radiculopathies, http://www.neuroanatomy.wisc.edu/SClinic/Radiculo /Radiculopathy.htm (last visited February 26, 2010).

patient's pain syndrome and paresthesiae match a C6 radiculopathy quite well in spite of the lack of objective neurological deficits or EMG confirmatory findings." Id. Dr. McCann agreed that Johnson was a surgical candidate and suspected she would do well with decompression of the right C6 cervical nerve root by either the posterior or anterior approach, although he would favor the latter. Id.

Johnson treated with Dr. Edward Fischer, a neurologist at the Boston University Medical Center for persistent right-sided neck and arm pain and discomfort following the May 5, 1994 automobile accident. (A.R. 170). Dr. Fischer's impression was that she had a right C6 radiculopathy secondary to the automobile accident of May 5, 1994. He found that her symptoms fit a right C6 radiculopathy, and that the EMG findings of October 28, 1994 also supported this finding. (A.R. 172). In a consultation on November 9, 1994 Dr. Fischer considered Johnson a patient for surgical decompression, but due to her young age prescribed Nortriptyline and a swim program to alleviate her pain. (A.R.172). She was seen by Dr. Fischer in follow-up consultations on December 28, 1994 and February 8, 1995 for symptoms of right C6 radiculopathy. (A.R. 166). At that time she was still receiving treatment with a muscle therapist three times per week and taking Elavil which was not effective in controlling her pain. She was also taking 800mgs of Motrin and remained on work disability status. Dr. Fischer increased the dose of Elavil from 50mgs to 75 mgs and advised Johnson to continue her swim program and physical therapy exercises. Johnson was referred for a follow-up EMG by Dr. Fischer at the Boston Medical Center Hospital on January 26, 1996. At the time of her examination she was complaining of stiffness in the neck with radiation of pain sensation in the right arm. She indicated improvement of the neck and right shoulder pain but continued pain in her right arm and had recently felt a lump on the left side of her neck with headache behind her left ear. (A.R. 165). EMG and nerve conduction studies of the right upper extremity and needle sampling of C5-6 and C6-7 showed evidence of a mild, reinervated right C6 root lesion. Id.

On September 14, 1994 Johnson saw Dr. Fullerton complaining of neck pain radiating to the right radial forearm, essentially unchanged since the onset of her May 4, 1994 accident. (A.R. 220). She reported that Norflex 100mgs BID and Motrin 800mgs were helpful. Dr. Fullerton referred her to Dr. David Roth, a microneurosurgeon for additional evaluation as a result of her persistent pain. Id. Dr. Roth first saw Johnson for a neurological consultation on February 17, 1995. (A.R. 214). The patient rated her pain as a 7 on a scale of 1 to 10 in severity. Dr. Roth concluded Johnson was experiencing chronic and medically

1 intractable neck and right arm pain and paresthesias with evidence of a herniated cervical disc by MRI scan

2 and C6 radiculopathy by EMG.  (A.R. 214 - 215).

3      Johnson had a comprehensive visit with Dr. Jules Nazzaro on October 20, 1994 complaining of right-

4 sided neck discomfort radiating to the right suprascapular area and shoulder area and discomfort and

5 paresthesias radiating down her right arm.  (A.R. 234 - 235).  At the time of the visit she was taking Flexeril

6 three times a day and Norflex three times a day.  (A.R. 235).  Dr. Nazzaro discussed Johnson's options with

7 her in detail.  Johnson stated she felt she had exhausted conservative measures and had been evaluated by

8 an outside neurosurgeon.  (A.R. 237).  In a follow-up visit on November 1, 1994 Dr. Nazzaro recommended

9 against surgical intervention.  (A.R. 230).

10     On August 12, 1994 Johnson was advised by her physical therapist, James Leonardo, M.S.P.T., not

11 to work for three weeks or until she gained approval from her primary physician as a result of her herniated

12 cervical disc and persistent pain in her neck and arm.  (A.R. 287).  On November 4, 1994 Leonardo noted

13 that Johnson was reporting pain of 9 on a scale of 1 to 10 following a myelogram and EMG.  (A.R. 281).

14 A note in his medical records reflects Dr. Jabrey reported the results of her myelogram, EMG and CT Scan

15 indicating evidence of nerve damage down her right and to her fingers.  (A.R. 281).

16     Johnson was first seen by Microneurosurgeon Dr. David Roth on February 7, 1995 at the request of

17 her physical therapist James Leonardo.  (A.R. 204).  On March 15, 1995 Johnson underwent a cervical

18 analgesic diskography in which Xylocaine was injected at the C5-6 level.  (A.R. 249).  Prior to the procedure

19 Johnson complained of neck and right shoulder pain with radiation down the right arm.  She also complained

20 of tenderness and muscle spasm of the right trapezius and scapular muscles with limitation of motion.

21 Following the Xylocain injection she reported 70% improvement and returned to full range of motion of the

22 neck reporting no arm pain.  Tenderness and muscle spasm of the cervical paraspinal muscle also diminished

23 which Dr. Roth found "a positive test at this level."  (A.R. 249).  On May 4, 1995, Johnson was admitted

24 to Melrose Wakefield Hospital and underwent an anterior cervical microdiskectomy at the C5-6 interspace[7]

25 (A.R. 242).  The procedure was performed by Dr. Roth who found moderately large right-sided gritty,

26

27

---

28      [7]  The procedure used to remove a herniated disk and relieve pressure on a nerve root.  <u>See</u> Spine
Inc., http://www.spine-inc.com/glossary/d/diskectomy.html (last visited February 26, 2010).

granular disc prolapse extending into the intervertebral foramen and slightly above it, surrounded by moderate amounts of granulation tissue. He also found small marginal osteophytes at that level. He performed a fusion and discharged Johnson with prescriptions for Percoset, and Decadrin followed by Motrin. (A.R. 242).

Following her diskectomy and fusion, Johnson was prescribed more physical therapy for pain in her neck and soreness at the area of the right C6-7 and a constant burning sensation in her right upper arm and forearm. (A.R. 266-289). Six weeks post-surgery her arm improved but she complained of residual numbness and a recent onset of paresthesias in the left arm and hand after sleeping. She was taking Motrin and Elavil for pain. (A.R. 277). Four months post-operatively she complained of continuing neck pain radiating to the right shoulder and upper arm, pain at the left side of the neck causing occasional headaches. On examination she exhibited moderate spasm and tenderness of the left paraspinal and right trapezius muscles. She was prescribed continued physical therapy with limited repetitive motions of the right upper arm and Soma. (A.R. 277).

On January 9, 1996 Dr. Roth allowed Johnson to return to work no more that twenty hours per week. (A.R. 207). Restrictions imposed at that time consisted of: (a) no repetitive neck movements; (b) no prolonged neck flexion or extension; (c) no heavy lifting; and (d) no lifting above the shoulders or working above shoulder height. (A.R. 207 - 209). On February 6, 1996 Dr. Roth provided his medical opinion that Johnson was not currently able to return to her previous full-time occupation because of the physical demands and emotional distresses involved with the position. At that time Johnson continued to experience chronic headaches, neck pain and arm discomfort. She was working twenty hours per week and being seen by Dr. Popovich, a pain specialist for active management of her chronic pain syndrome. (A.R. 207).

On March 11, 1996 Dr. Roth opined that Johnson had a permanent partial disability as a result of injuries sustained in the May 5, 1994 automobile accident. He diagnosed Johnson with a right C5-6 herniated disc with C6 nerve root compression. (A.R. 205). He concluded Johnson had reached a medical end result and that it was probable she would continue to experience episodic neck and arm pain and headaches and would need symptomatic medical care for these complaints. Id. He opined that Johnson was totally disabled from August 26, 1994 to October 16, 1995. (A.R. 204 - 206). He based his opinions on AMA Guides to the Evaluation of Permanent Impairment, Fourth Edition (1993) indicating Johnson had

experienced the loss of function rated in terms of impairment of the whole person as follows: (1) cervical spine surgically treated disc lesion with residual medically documented pain and rigidity with muscle spasm rated at 9%; (2) abnormal range of motion of the cervical spine rated at 4%; (3) C6 unilateral spinal nerve root involvement with sensory deficit, extremity pain and loss of strength rated at 6% for a combined 18% whole person impairment. (A.R. 206).

In November 1995 Johnson began treating with Dr. Brana Popovich, a pain management specialist. She was referred to the Pain Diagnostics and Rehabilitation Clinic by Dr. Fichera for evaluation and treatment of persistent neck, shoulder and right arm pain. (A.R. 410). Johnson complained of pain in both shoulders, primarily on the right side in the suboccipital region with severe headaches and pain radiating from right shoulder down to the right upper extremity. Id. During the initial consultation on November 13, 1995 Johnson was taking Flexeril, Elavil and Motrin. Dr. Fichera referred her to the clinic recommending treatment of myofascial trigger points for severe headaches and pain radiating from her right shoulder down to her right upper extremity. (A.R. 410). Dr. Popovich diagnosed her with status-post surgical decompression of C6 nerve root and myofascial pain syndrome[8] with trigger points. She began administering lidocaine injections and recommended additional physical therapy treatment followed by a spray and stretch technique and stretching exercises. (A.R. 411). Johnson continued to treat with Dr. Popovich through June 11, 1997. (A.R. 379). She complained of headaches at time very severe and persistent neck, shoulder and right arm pain throughout her course of treatment. (A.R. 379-415). She was prescribed Imitrex, Elavil, Motrin 800, Cataflam and Flexeril to relieve the pain during her course of treatment with Dr. Popovich. (A.R. 390).

In the spring of 1996, Johnson visited with Tad S. Davis, M.D., a Certified Psychologist, who diagnosed her with major depressive disorder and chronic pain syndrome resulting from her inability to control and manage the pain in her back. (A.R. 191). Johnson had gone back to work on a part-time basis as an airline ticketing agent and reported that this helped her morale and decreased her social isolation but

---

[8] A chronic form of muscle pain that centers around the sensitive points in muscles called trigger points. Myofascial pain caused by trigger points has been linked to many types of pain, including headaches, jaw pain, neck pain, low back pain, pelvic pain, and arm and leg pain. See MayoClinic.com, http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042 (last visited February 26, 2010).

1    the increase in activity worsened her chronic pain. (A.R. 190). Dr. Davis prescribed Ambien for sleep,

2    Zoloft for depression, and Voltaren for back pain. (A.R. 191). Dr. Davis opined that Johnson's chronic pain

3    and depression were a direct result of injuries sustained in the automobile accident in 1994 and

4    recommended that she participate in an intensive chronic pain management program. (A.R. 192). However,

5    as of April 1996 Johnson had exhausted her rehabilitation benefit and could not afford the recommended

6    treatment. (A.R. 192).

7                           **B.    Johnson's Subsequent Injuries.**

8            On June 29, 1997, Johnson suffered an injury while pushing a wheelchair at work, resulting in a

9    sprain/strain to her left sacroiliac joint. (A.R. 301). The sprain/strain was further exacerbated by Johnson's

10   pregnancy, as well as the prolonged sitting resulting from her commute and sedentary job. (A.R. 301). Her

11   initial response to treatment was as expected and she noted immediate reduction in pressure and felt looser.

12   She reported improvement with subsequent visits. Id. John M. Rice, D.C. at the Merrimack Chiropractic

13   Center opined that the one to two hour commute to her job, eight hours of prolonged sitting at work, and her

14   pregnancy caused further postural stress to her low back and that a combination of these factors made it

15   impossible to stabilize the initial injury. Id. Her condition had become more chronic. Johnson reported

16   improvement with time away from work, but a return of symptoms when she returned to her normal duties.

17   She planned on taking ten days off to see if return to work was possible. Id. Rice advised her to avoid return

18   to work until after her delivery if her symptoms returned. Id. Johnson received physical therapy from St.

19   Joseph Family Medical Center/Hospital beginning July 3, 1997, as a result of this injury, and was prescribed

20   a period of physical therapy for a condition diagnosed as pelvic torsion. (A.R. 325 - 327).

21          On August 26, 1998 the plaintiff was in another automobile accident. She was a passenger in a car

22   and was turning to look back at her baby when the accident happened and she felt her neck "pop". She was

23   treated in the emergency room at Saints Memorial Medical Center for neck and knee pain. An x-ray of her

24   right knee was negative. An x-ray taken of the cervical spine indicated a fusion present with no

25   abnormalities or soft tissue swelling. She was prescribed ice and heat treatments and advised to follow-up

26   with her primary physician. (A.R. 254 - 258).

27   ///

28   ///

In March 1999, Johnson was treated for lumbar strain syndrome.  (A.R. 422).  She reported tenderness in the sacroiliac area on the left side, consistent with a sacrioliitis.[9]  (A.R. 422).  In June 1999 a liver lesion was discovered in a CAT Scan.  She was seen by Dr. Richard Freeman at the New England Medical Center to discuss treatment for her liver lesion. (A.R. 311).  She was asymptomatic, and due to the lack of any symptoms attributable to this lesion she was advised to have a follow-up CAT Scan in six to twelve months and to discontinue oral contraceptives. Id.  Dr. Freeman also noted trace ankle edema during his physical examination and suggested a work-up with an MR angiogram.

In September 2002, Johnson broke her right shoulder when she fell and landed with her arm extended to break her fall. (A.R. 474).  The injury caused pain and weakness, clicking, and it limited Johnson's range of motion.   (A.R. 456, 474).  In December 2002, Johnson underwent an arthroscopic subacromial decompression[10] as well as a debridement[11] for a partial thickness rotator cuff tear in her right shoulder. (A.R. 368, 456-57).

On July 8, 2003, Johnson was involved in another automobile collision. (A.R. 151).  Johnson's car was rear-ended by another automobile, and as a result of this accident, Johnson suffered severe lower back pain, whiplash, and she reinjured her pre-existing cervical spine injury. (A.R. 151).  She was seen by Dr. Douglas Goumas at the Orthopaedic Center on August 6, 2003 complaining of low back pain.  Dr. Goumas noted that she was treated by her primary care physician for immediate low back pain experienced during the accident with a Medrol Dose Pak. (A.R. 367).  In her visit with Dr. Goumas she reported that she was doing fine until several weeks after the accident when she tried to get out of a pool and felt her legs going numb for several seconds. Id.  On physical examination she demonstrated some pain to palpation around

[9] An inflammation of one or both sacroiliac joints (those joints that connect the lower spine and pelvis).  With sacrioliitis, even slight movements of the spine can be uncomfortable or painful.  See MayoClinic.com, http://www.mayoclinic.com/health/sacrioliitis/DS00726 (last visited February 26, 2010).

[10] Arthroscopic surgery used to treat debridement of partial and full tears of a rotator cuff.  See http://www.ortho-md.com/subacromial%20decompression.htm (last visited February 26, 2010).

[11] Term referring to the removal of dead, damaged, or infected tissue to improve the healing potential of the remaining healthy tissue.  See Aurora Health Care, http://www.aurorahealthcare.org/ yourhealth/healthgate/getcontent.asp?URLhealthgate=%2214803.html%22 (last visited February 26, 2010).

-10-

the paralumbar musculature especially over the left side. The doctor also noted pain with extension and minimal pain with flexion. Neurologically her extremities were in tact and no motor or sensory deficits were noted. The straight leg test was negative. X-rays demonstrated some arthritic changes of the posterior elements, but nothing severe. Dr. Goumas diagnosed her with low back strain with some nerve root irritation and treated her conservatively. Id. On September 11, 2003 Johnson was seen in a follow-up visit for low back pain. A straight leg test was positive for pain in the low back with no radiculopathy. An MRI demonstrated some degenerative changes at L5-S1 but was otherwise negative. Dr. Goumas referred her to Dr. Lewis and Leahy for a work-up concerning her back pain. (A.R. 366).

Between 1998 and 2004, Johnson was treated by Bedford Family Practice and Ambulatory Surgical for various ailments, including chronic neck pain, status post microdiskectomy, chronic back pain secondary to degenerative disc disease, headaches, depression, and right rotator cuff tear with impingement status post arthroscopic subcromial decompression with extensive debridement. (A.R. 427-479).

At the request of the Social Security Administration Johnson was seen by Miles S. Morgan, a clinical psychologist who conducted a mental status examination on February 5, 2004. (A.R. 17, 480). Dr. Morgan noted that Johnson was able to maintain an upright posture while sitting for the examination but did appear to be experiencing physical pain. (A.R. 4870). She became tearful when describing the nature of her disability, and related her automobile accidents in 1994, 1998 and 2003. Id. She moved to Las Vegas in November 2003 because her doctors in New Hampshire believed the dry climate would decrease her chronic pain. (A.R. 481). She reported being diagnosed with depression in 2003 in New Hampshire. Id. Her current medications included Lexipro, Flexeril, Imitrex, and Ambien. Id. She also reported that she was attempting to limit her pain medication because she became so tired she was unable to adequately care for her children. Id. However, this caused chronic pain throughout the day. Id. On mental status examination Dr. Morgan concluded that she did not have any significant deficits with intellectual functioning. (A.R. 483). She did not display any significant memory deficits, and all of her scores were within the average to high average range. (A.R. 484). However, on functional assessment Dr. Morgan found that she was likely functioning minimally within the average range of intellectual ability and that it was likely she experienced decline with cognitive functioning when taking pain medication. Id. He found that she did not demonstrate depressive symptoms at a level that would significantly interfere with her ability to understand or remember

1  complex instruction.  Id.  However, he noted she becomes easily distressed when discussing her physical

2  limitations and found she would likely have some difficulty sustaining social interactions within a work

3  setting.  Id.  He diagnosed her with a mood disorder due to back injury.  Id.  Because she had experienced

4  no reported improvements with pain or physical functioning following treatment after her 1994 automobile

5  accident  he concluded her depression had persisted and that she should be assessed by a psychiatrist to

6  ensure she is taking the appropriate type and dose of medication.  Id.  He opined that her prognosis for

7  significant recovery from depressive symptoms would be dependent on her response to medical intervention,

8  and that her depression appeared to be directly related to the onset of medical problems.  (A.R. 484 - 485).

9       On February 20, 2005, Johnson was involved in another accident.  (A.R. 536).  While loading

10  groceries into her car, another vehicle reversed from its parking spot and pinned her to the bumper of her

11  car.  Id.  She was taken to the hospital by ambulance.  Id.  She was seen at Las Vegas Neurosurgery,

12  Orthopaedics & Rehabilitation, LLP by Dr. Mark B. Kabins, complaining of pain in her neck, low back pain

13  with aching stiffness and numbness in her left leg down the back of her leg to the foot.  Id.  She claimed to

14  experience immediate pain after the accident and was initially seen by Dr. Loring and Dr. Jacobs.  Id.  At

15  the time of her visit with Dr. Kabins she complained of pain of a 10 on a scale of 1 - 10.  Id.  She reported

16  she could only sit three to four minutes, stand three to four minutes, lie down five minutes at a time and that

17  her walking distance was six feet.  Id.  She complained that she woke up many times at night from pain and

18  was unable to do her household chores and daily activities although she was able to drive.  Id.

19       At the time of her July 11, 2005 visit with Dr. Kabins she was taking Lortab, Flexeril, Mobic,

20  Ambien, and Imitrex.  Radiographs and testing performed revealed a C-spine lateral flexion/extension with

21  no gross evidence of instability, abnormal motion or translation.  AP and lateral radiograph of the

22  lumbosacral spine demonstrated disc space narrowing at L5-S1 with lateral flexion/extension views

23  demonstrating foraminal stenosis, particularly at the L5-S1.  An MRI scan of the lumbosacral spine

24  demonstrated a central disc protrusion at L5-S1 level with disc dehydration.  Id.  On physical examination

25  Johnson demonstrated a well healed anterior neck incision, mild restrictive neck range of motion with no

26  neurologic deficit in her upper extremities.  (A.R. 538).  With respect to her low back, she could bend

27  forward only 40 degrees and extend just beyond neutral.  Id.  She had a positive straight leg raise and

28  Lasegue's sign on the left and was negative on the right.  Id.  She had decreased sensation in the L5

distribution on the left.  Id.  Dr. Kabins diagnosed Johnson with a herniated nucleus pulposus L5-S1 with a possible disc disruption at L5-S1[12].  Id.  He also diagnosed low back pain with left lower extremity radiculopathy.  Id.  He gave Johnson a prescription for Restoril for sleeping at night and ordered electrical diagnostic studies of the lower extremities.  Id.  He also recommended physical therapy including low back reconditioning, abdominal strengthening and pelvic stabilization.  Id.  He found a left L5 and S1 selective nerve root block was indicated, and directed Johnson to return in three weeks for follow-up.  Id.

An MRI of the lumbar was taken at Diagnostic Imaging of Southern Nevada on April 11, 2005.  The MRI revealed a broad-based central disc protrusion without significant central canal stenosis or nerve root compression at L5-S1 and mild facet degeneration at the L4-L5 and L5-S1 levels.  (A.R. 550).

Dr. Kabins referred Johnson to Michael J. McKenna, M.D., FIPP, at the Interventional Pain Medicine of Nevada.  She was first seen by Dr. McKenna on August 1, 2005 complaining of pain in her back extending into her left lower extremity following her February 2005 pedestrian versus motor vehicle accident. (A.R. 553).  She complained of aching, stabbing and constant pain and rated it an 8 up to 9 on a scale of 10 which increased with transitioning from sitting to standing, prolonged sitting, prolonged standing and walking.  Id.  She denied pain in her right lower extremity.  Id.  The pain in her left extremity extended into the left foot and most significantly into the left big toe.  Id.  She was taking Lortab and Mobic.  Id.  On physical examination Dr. McKenna noted her gait was antalgic favoring the left leg. (A.R. 554).  A straight leg test was positive on the left and negative on the right.  Id.  Lasegue's sign was positive on the left.  Id.  He noted decreased sensation of the lateral and posterior aspect of the left leg and the dorsum of the left foot.  Id.  Deep tendon reflexes were symmetric and motor strength intact.  Id.  Bending forward caused her pain at 45 degrees.  Id.  Her extension was full and her hip external rotation did not cause pain.  Id.  Dr. McKenna assessed her with left lower extremity radiculopathy and evidence of L5-S1 disc pathology.  Id.  He considered her a candidate for transforaminal epidural injection to attempt symptomatic relief.  Id.  He opined that if injection was ineffective Johnson may be a candidate for provocation discography.  Id.

On August 23, 2005 Dr. McKenna performed a selective transforaminal epidural steroid injection under local anesthesia at the left L5, L5-S1 neuroforamina area.  He also performed an Epidurography,

---

[12] The medical term for a herniated or slipped disc.  See Medscape, from WebMD, http://www.medscape.com/viewarticle/512033_3 (last visited February 26, 2010).

Fluroscopy, and X-ray of the lumbar spine.  Under conscious sedation, Lidocaine and Methylprednisolone were injected.  (A.R. 547-48).

The plaintiff treated with Jacobs & Modaber, M.D.s beginning February 6, 2006.  Bone density and vertebra assessments were performed which revealed Osteopenia in the lumbar, hips and forearm areas. Scans were performed of the lumbar spine and left hip.  (A.R. 522 - 527).

On July 21, 2004, May 10, 2006 and September 5, 2006, Dr. Roth opined that Johnson became totally and permanently disabled beginning on October 27, 1997.  (A.R. 202, 540).  He diagnosed her with: "(a) herniated cervical disc followed by cervical fusion and residual permanent nerve damage; (b) fibromyalgia; (c) myofascial pain syndrome; (d) lumbar discogenic degenerative disease with pain; (e) L5-S1 disc herniation; (f) osteoporosis in the hips, spine, and forearm."  (A.R. 541).  As a result of  these diagnoses, Dr. Roth concluded Johnson was totally and permanently disabled for any kind of employment. (A.R. 541).

## DISCUSSION

### I.    Standard of Review

Johnson seeks judicial review of the Commissioner's decision determining that she was not eligible to receive disability insurance benefits.  Johnson timely requested review by the Appeals Council which declined her request for review on September 12, 2007.  When the Appeals Council denies a request for review of an ALJ's decision, the decision of the ALJ represents the final decision of the Commissioner.  See 20 C.F.R. § 404.981. Johnson then filed this action seeking judicial review of the Commissioner's decision. See 20 CFR § 404.901(a)(5); 42 U.S.C. § 405(g).  This matter was referred to the undersigned for a report of findings and recommendations pursuant to the provisions of 28 U.S.C. §§ 636 (b)(1)(B) and (C).

District courts review administrative decisions in social security benefits cases under 42  U.S.C. § 405(g).  See Akopyan v. Barnhart, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides, in relevant part, that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides."  42  U.S.C. § 405(g).

///

42 U.S.C. § 405 (g) provides that the District Court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  The Ninth Circuit reviews a decision of a District Court affirming, modifying or reversing a decision of the commissioner *de novo*.  Batson v. Commissioner 359 F.3d 1190, 1193 (9th Cir. 2003).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  The Commissioner's findings may be set aside if they are based on legal error or are not supported by substantial evidence.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see also Lewis v. Apfel, 236 F.3d 503 (9th Cir. 2001).  In determining whether the Commissioner's findings are supported by substantial evidence, the court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3rd 715, 720 (9th Cir. 1998); see also Smolen, 80 F.3d at 1279 (holding that courts must weigh both the evidence that supports and the evidence that detracts from the Commissioner's conclusion).  Under the substantial evidence test, the Commissioner's findings must be upheld if supported by inferences reasonably drawn from the record.  Batson 359 F.3d at 1193. When the evidence will support more than one rational interpretation, the court must defer to the Commissioner's interpretation. Id.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's judgment.  Flaten v. Sec'y of Health and Human Serv., 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings.  Lewin, 654 F.2d at 635 (citing Baerga v. Richardson, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine under 42 U.S.C. § 405(g) whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based."  Lewin, 654 F.2d at 635.

///

-15-

## II.    **Disability Evaluation Process**

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a)    she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999); see also 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). If a claimant establishes an inability to perform her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. Batson, 157 F.3d at 721.

A plaintiff seeking Social Security disability benefits is also required to prove that he or she became disabled on or before his or her date last insured ("DLI").  Flaten v. Sec'y of Health & Human Serv., 44 F.3d at 1458-1459; see also 20 C.F.R. § 404.1520; Morgan v. Sullivan, 945 F.2d 1079, 1080 (9th Cir. 1991) (per curiam).  To qualify for social security disability benefits, a claimant must be fully insured and have at least twenty quarters of coverage in the forty-quarter period which ends in with the quarter in which the disability occurred.  See 42 U.S.C. §§ 416(i)(3), 423(c)(1); 20 C.F.R. § 404.130(b).  "[T]estimony from family, friends, and neighbors are all relevant to the determination of a continuously existing disability with onset prior to expiration of insured status." Flaten, 44 F.3d at 1461 n.5 (citing Hartman v. Bowen, 636 F. Supp. 129 (N.D. Cal. 1986)).  The requirement that an individual seeking benefits be insured at the time the individual suffers the disability is intended to "encourage individuals who have previously suffered from a disability to return to substantial gainful employment when their medical condition improves sufficiently to allow them to do so." Flaten, 44 F.3d at 1459 (citing S. Rep. No. 1856, 86th Cong., 2d Sess. (1960),

reprinted in 1960 U.S.C.C.A.N. 3608, 3623-3625).  The ALJ found, and it is undisputed, that Johnson meets the non-disability requirements of Section 216(i) of the Social Security Act and was insured for disability benefits through March 31, 2004.

### A.    Five-Step Sequential Evaluation Process

20 C.F.R. § 416.920 establishes a five-step sequential evaluation process to be followed by the ALJ in a disability case.  Mendoza v. Apfel, 88 F. Supp. 2d 1108, 1111 (C.D. Cal. 2000).  The first step requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. 416.920(b).  If the claimant is currently engaged in substantial gainful activity, a finding of non-disabled is made, and the claim is denied.  The second step requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments that significantly limit him or her from performing basic work activities.  20 C.F.R. § 416.920(c)).  If the ALJ determines that the claimant has no such impairment, a finding of non-disabled is made and the claim is denied.  The third step requires the ALJ to compare the claimant's impairment(s) with those impairments in the Listing of Impairments ("Listing") located at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. § 416.920(d).  If the impairment(s) meets or equals an impairment in the Listing, disability is conclusively presumed and benefits are awarded.

If the impairment(s) do not meet or equal an impairment in the Listing, step four requires the ALJ to determine whether the claimant has sufficient residual function capacity ("RFC") despite her impairment(s), to perform her past work.  20 C.F.R. § 416.920(e).  RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.  Social Security Administration, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 SSR LEXIS 5, *8.  If the claimant is still capable of performing her past work, a finding of non-disabled is made and the claim is denied.  The claimant has the burden of proving that she cannot perform her past work.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998).  If the claimant cannot perform her past work, a prima facie case of disability is established and step five shifts the burden to the ALJ to prove that the claimant, based on her age, education, work experience, and RFC, can perform other substantial gainful work that exists in significant numbers in the national economy.  20 C.F.R. § 416.920(f).  If the ALJ finds that any one of the five steps establishes that the claimant is not disabled, no further evaluation is required.  20 C.F.R. § 404.1520(a).

Here, the ALJ determined at step one that Johnson has not engaged in substantial gainful activity since the alleged onset date of her disability, October 25, 1998.[13] (A.R. 30). At step two, the ALJ found that Johnson had the following medically determinable impairments that are severe within the meeting of the Social Security Act: cervical disk disease status post fusion, lumbar degenerative disease, status post right shoulder arthroscopic surgery, and an affective disorder. Id. The ALJ found that these impairments imposed more than minimal restrictions on her ability to engage in basic work-related functions, and that she has "severe" impairments within the meaning of the Regulations, specifically 20 CFR § 404.1523. Id. At step three, the ALJ found Johnson's impairments do not meet or equal any of the impairments in the Listings because no examining or treating doctor has mentioned findings equivalent in severity to the criteria of any of the listed impairments. Id. She also relied on the state agency medical consultants' (not identified in the decision) conclusions that Johnson's condition did not meet or equal any listed impairment. Id. Her decision also stated that Dr. Schorn, an independent medical expert she called at the hearing, testified that Johnson's impairments did not meet or equal any listed impairment. Id.

At step four, the ALJ determined that Johnson had not met her burden of proving that she cannot perform her past relevant work. (A.R. 30-31). The ALJ examined whether Johnson retains the residual functional capacity ("RFC") to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. 20 C.F.R. § 404.1545 and Social Security Ruling 96-8(p). The ALJ found that prior to Johnson's date last insured (March 31, 2004), Johnson retained the RFC to perform sedentary level work either with mild limitation in sustaining attention or simple, repetitive tasks with minimal interaction with the public and a sit/stand option. (A.R. 32). She based this decision on Dr. Roth's April 14, 2003

---

[13]The Plaintiff alleges she became disabled on October 25, 1998. (A.R. 30). See also Plaintiff's Complaint ¶ 5. Defendant's Answer admitted the allegations in Paragraph 5 of Plaintiff's Complaint. See Answer (#15) ¶ 5. The ALJ's decision also indicates that Plaintiff alleges she became disabled on October 25, 1998. (A.R. 30). However, the third paragraph of Page 2 of her decision states "no evidence has been presented to indicate that the Claimant has engaged in substantial gainful activity after her January 30, 2004 alleged disability onset date." Nothing in the administrative record supports a finding of a January 30, 2004 disability onset claim.

report indicating he had been treating Johnson since 1995 for a herniated disc for which she underwent surgery and chronic degenerative lumbar disc disease.

She also relied on treatment notes from the Bedford Family Practice and Ambulatory Surgical dated September 1998 to January 2004 showing Johnson was evaluated and treated for complaints of chronic neck pain status post microdiskectomy and chronic back pain secondary to degenerative disc disease, headaches, depression, right rotator cuff tear with impingement status post arthroscopic subcromial decompression and extensive debrievement in 2002. She cited treatment notes from the Orthopedic Center-Manchester dated September 10, 1998 to September 11, 2003 showing Johnson was evaluated and treated for complaints of right shoulder pain status post right shoulder arthroscopic surgery with good results, chronic neck low back pain secondary to degenerative disc disease, and occasional numbness and tingling down the left lower leg, but Johnson denied numbness or weakness. The ALJ specifically referred to x-rays taken August 6, 2003, straight-leg raising tests conducted September 11, 2003, and an MRI of the lumbar spine demonstrating degenerative changes at L5-F1 which was otherwise negative.

The ALJ also referred to Dr. Miles Morgan's consultative psychological examination on February 5, 2004 which diagnosed Johnson with a mood disorder due to her back injury, and reported her global assessment functioning ("GAF") as sixty-five, suggesting mild symptoms, but generally acceptable function. Finally, she relied upon some, but not all, of Dr. Schorn's testimony at the hearing. She found that Dr. Schorn testified that from his thorough review of the medical record, Johnson has the severe physical impairments of cervical disc disease status post fusion, lumbar degenerative disc disease, and status post right shoulder arthroscopic surgery. The ALJ's understanding of Dr. Schorn's testimony was that there was little objective evidence to support the claimant's disabling conditions. The ALJ acknowledged that Dr. Schorn testified that if one believed all of her pain and suffering really exists, then a somatoform listing would be met. However, she did not accept this testimony on the grounds Dr. Schorn's duty at the hearing was to opine on the medical evidence and not to evaluate the claimant's demeanor  (A.R. 31-32).

The ALJ found that mentally, Johnson has mild limitation of activities of daily living; moderate difficulties in maintaining social functioning precluding work involving more than minimal interaction with the public; moderate limitations of concentration, persistence, or pace; and no episodes of decompensation. The ALJ gave the State agency medical consultant's findings that Johnson could perform sedentary work

activity with additional non-exertional limitations less weight than they would ordinarily receive because they were prepared without the benefit of observing Johnson, listening to her testimony, or reviewing later medical evidence that was submitted.  She found the opinions of the State agency medical consultants who examined Johnson's mental condition to be generally consistent with the objective evidence of record for the period at issue.

In assessing Johnson's RFC, the ALJ addressed Johnson's allegations of disabling pain and functional limitations pursuant to the law of the Sixth Circuit Court of Appeals and Social Security Rulings 96-3p and 96-7p. (A.R. 33).  The decision does not indicate why she relied on Sixth Circuit law rather than Ninth Circuit law, or cite any Sixth Circuit decisions.  She found that Johnson's subjective allegations were not fully credible by clear and convincing evidence for a number of reasons.  First, the opinions of Plaintiff's treating chiropractor, John Rice, DC, were not medically acceptable sources; Rice did not provide objective medical evidence to support his opinions; his limited RFC findings seemed contradicted by his lack of progress notes; and viewing the objective medical evidence of record, his opinion of Johnson's limitations was a conclusion based mostly upon Johnson's subjective complaints rather than objective evidence.  Second, she relied on Dr. Schorn's testimony at the hearing "that there is little objective evidence to support any of the claimant's disabling conditions."  Id.  Third, She found Johnson contradicted her own testimony about whether or not she did or did not drive.  Fourth, she found Johnson's treatment "has been relatively conservative.".  Fifth, she found Johnson had not been taking any medications that imposed disabling side effects or medications at dosages commensurate with the alleged levels of pain.  Sixth, she found the record did not indicate that Johnson suffers from debilitating side effects from her medications.  Seventh, she found no treating or examining physician has opined that Johnson is totally and permanently disabled from all work.  Eighth, she found Johnson was able to participate in the administrative hearing and respond to questioning without any apparent difficulties.  Ninth, she found that Johnson described her activities of daily living which were not limited to the extent one would expect given Johnson's complaint of disabling symptoms and limitations.  Tenth, she found Johnson was apparently able to care for young children at home, which can be quite demanding both physically and emotionally, with only some assistance.  Id.  Thus, she concluded that Johnson's allegations of disabling functional limitations were not fully credible, and that

///

neither the objective medical evidence nor Johnson's subjective allegations "warrant any more restrictive functional limitations than those which are found in this case". Id.

Additionally, the ALJ considered the report of Johnson's mother, Kay Hoover, finding it did not establish that Johnson is disabled.  She based her finding on the fact that Ms. Hoover was not medically trained and, that as Johnson's mother, Ms. Hoover "cannot be considered a disinterested third-party witness." Most importantly, the ALJ found that significant weight could not be given to Ms. Hoover's report because her report, like Johnson's reports and testimony, were not consistent with the preponderance of the opinions and observations by medical doctors in this case.  (A.R. 34).

The ALJ found at step four that Johnson retains the RFC to perform the requirements of her past relevant work as a reservations clerk. Id.  She based this finding on the expert vocational testimony provided at the hearing by Alan Cummings, PhD.  She posed a hypothetical question to Mr. Cummings, which she believed assumed Johnson's age, education, past relevant work experience, and RFC as she had found.  Her reading of Mr. Cummings' testimony was that, given the hypothetical posed, Johnson would not be able to perform her past relevant work as a retail store manager, gate agent or sales person. Id.  The ALJ agreed with his analysis and so found. Id.  She also found that Mr. Cummings testified that prior to March 31, 2004, Johnson retained the RFC to perform sedentary level work with mild limitation in sustaining attention, and could return to her past relevant work as a reservation clerk. Id.  The ALJ therefore found Johnson had "consistently retained the residual functional capacity to perform her past relevant work as a reservations clerk as performed by the claimant, on a sustained basis." Id.

Although the ALJ was not obligated to make a finding at step five, she concluded after considering the opinions of Mr. Cummings, that Johnson was able to engage in other work existing in significant numbers in the national economy.  (A.R. 35).  Specifically, she found that Johnson could perform duties of an assembler or inspector, that there were approximately 5,000 assembler jobs and 3,000 inspector jobs in the regional economy, and approximately 161,000 assembler jobs and 40,000 inspector jobs in the national economy. Id.

In summary, the ALJ concluded that Johnson retained the capacity to perform her past relevant work as a reservations clerk and alternatively, she retained the capacity for other work that exists in significant

///

numbers in the regional and national economies.  She therefore found that Johnson was not disabled as defined by the Act at any time through March 31, 2004, the date last insured.  Id.

### B.    The Parties' Positions

#### 1.    Plaintiff's Motion for Reversal

Plaintiff's Motion for Reversal argues that the ALJ did not fairly evaluate the evidence in this case and only selectively cited those portions of the record that supported denial of Johnson's disability claim. Johnson claims that the opinions of her treating doctors were overlooked or discredited by the ALJ because she did not find objective clinical evidence supporting their opinions and findings.  Johnson also argues the ALJ impermissively rejected Johnson's testimony concerning her activities of daily living, and did not cite where in the record Johnson's testimony was inconsistent with complaints of disabling symptoms and limitations. Johnson contends that the ALJ characterized her treatment regiment as conservative despite the fact that Johnson has had several major surgeries.  Johnson also points out that the ALJ did not give adequate consideration to the disabling side affects of medications Johnson was taking, and improperly rejected the statement of her mother because she was not a doctor, and was her mother.  Johnson asserts that the ALJ misapprehended the nature of her impairments, and that the ALJ's summary of the medical records was "terse, incomplete and not entirely accurate."

Johnson contends that the hearing testimony of Dr. Victor Schorn supports a finding of disability because he cited repeated episodes of decompensation when Johnson attempted to return to work, and opined that even if Johnson was able to obtain a position, he doubted that she would be able to fulfill the requirements of an 8-hour day or 40-hour work week.  Johnson also argues that the hypothetical questions posed to Mr. Cummings, the vocational expert who testified at the hearing, were inaccurate because the first assumed Johnson retained the capacity to do sedentary work with an additional mild problem in concentrating, and the second assumed the ability to perform sedentary physical work involving simple repetitive tasks with no exposure to the public or co-workers.  Based on these inaccurate hypotheticals, Mr. Cummings testified an individual with these limitations would be able to return to work as a reservations clerk.

Johnson argues that the Commissioner's decision must be reversed because the ALJ did not consider records of Johnson's treatment prior to January 30, 2002, or only considered them in less than two sentences.

1   Johnson also asserts that the ALJ did not consider Johnson's limitations and restrictions as required by
2   Social Security Ruling 96-8p.  Specifically, Johnson claims that although the ALJ acknowledged she
3   suffered from severe impairments, she erred as a matter of law in making the severity determination at step
4   two of the sequential analysis because she did not appropriately evaluate how Johnson's non-exertional
5   impairments affected her functioning.  The ALJ did not make a threshold finding concerning whether
6   Johnson suffers from a medically determinable impairment which reasonably could be expected to produce
7   her subjective complaints of pain, headaches and numbness.  Because the record was replete with references
8   to these subjective symptoms the ALJ should have, but did not address them.  Johnson claims that her
9   complaints of chronic pain are compatible with Social Security Regulation 99-2p, which addresses proof
10  of chronic fatigue syndrome, migraine, somatoform, and like disorders which cannot be established through
11  laboratory or imaging tests.  She also relies on Social Security Ruling 96-8p, which requires an adjudicator
12  to explain how any major inconsistencies or ambiguities in the evidence in the case were considered and
13  resolved.  In this case, the ALJ did not consider or address Dr. Roth's opinion that Johnson was disabled.

14      Johnson also argues that the ALJ improperly rejected Johnson's testimony concerning pain from
15  migraine headaches and other chronic conditions because of an asserted absence of objective evidence.
16  Johnson claims that her chronic pain syndrome is analogous to other impairments not easily quantified such
17  as Complex Regional Pain Syndrome which is discussed in Social Security Ruling 03-02p.  Johnson points
18  out that this regulation provides that chronic pain syndrome cannot be rejected merely because a claimant's
19  complaints are out of proportion to the clinical and laboratory findings, but this is precisely what the ALJ
20  did in evaluating Johnson's pain complaints.

21      Johnson contends the ALJ did not consider all of her impairments together and assess their
22  cumulative affect on her ability to work as required by Social Security Ruling 96-8p.  Specifically, she
23  argues that the ALJ did not take into account her significant non-exertional impairments and their
24  cumulative affect on her ability to work.  She also contends that the reasons given by the ALJ for
25  discrediting her subjective symptoms did not meet the clear and convincing standard required in the Ninth
26  Circuit.  She cites Social Security Ruling 96-7p and Ninth Circuit cases to support her arguments that the
27  ALJ may not discredit a claimant's testimony solely on a perceived lack of objective findings.
28  ///

1    She also contends that Mr. Cummings' vocational expert testimony is not supported by substantial

2    evidence because the ALJ posed incomplete hypotheticals.  As such, Mr. Cummings' opinions have no

3    evidentiary value.  She asserts the ALJ failed to accord proper weight to her treating physicians' medical

4    opinions and made an unsupported finding in the record that no treating or examining physician had opined

5    that Johnson was totally and permanently disabled from all work.  Finally, Johnson argues that under

6    established Ninth Circuit precedent, when an ALJ fails to provide adequate reasons for rejecting the opinions

7    of a treating or examining physician, the Court must accept those opinions as a matter of law.  Similarly, the

8    Ninth Circuit has held that if an ALJ's reasons for rejecting a claimant's testimony are not supported by clear

9    and convincing evidence, the claimant's testimony must be taken as true.  Because there is no suggestion

10    in the record that Johnson is malingering, the reasons given for rejecting her testimony were not clear and

11    convincing.  For all of these reasons Johnson asks that the Court remand this case under sentence four of

12    42 U.S.C. 405(g) with instructions to award benefits.

13    **2.    Defendant's Motion to Voluntary [sic] Remand.**

14    The Defendant did not oppose Plaintiff's Motion for Reversal or comply with the Court's Scheduling

15    Order (#17).  Rather, the Defendant filed a two-page Motion indicating the Commissioner has agreed to a

16    voluntary remand of this case pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative

17    proceedings. The Commissioner suggests the ALJ should be directed to "update the evidentiary record" and

18    offer Plaintiff an opportunity for a new hearing.  Specifically, the Commissioner states he will instruct the

19    ALJ to evaluate Plaintiff's diagnosed migraines, chronic pain syndrome, somatoform disorder and

20    myofascial pain syndrome, and determine whether these impairments are severe and what limitations, if any,

21    are caused by these impairments.  Additionally, if a sentence four remand is granted, the ALJ will be

22    instructed to address and consider the opinion of Victor Schorn, M.D., that Plaintiff could not work full time

23    and the opinion of David Roth, M.D., that Plaintiff was disabled by chronic pain and was permanently and

24    totally disabled.

25    **3.    Plaintiff's Reply to Defendant's Motion for Remand**.

26    Plaintiff filed a Reply arguing the agency's proposal violates the Social Security Act by requesting

27    voluntary remand after the commissioner filed an Answer.  Additionally, the Defendant ignores controlling

28    Ninth Circuit authority that if an ALJ improperly rejects testimony and other medical evidence, the

1   testimony and evidence is taken as true as a matter of law.  Thus, the Court should exercise its discretion

2   to reverse the ALJ's decision and order payment of disability benefits without remanding this case for a

3   rehearing.

4                    **4.      Defendant's Reply to Plaintiff's Response (#27)**.

5           Defendant filed a Reply which argued that its request for remand for further administrative

6   proceedings is authorized by the Social Security Act, notwithstanding that the Motion was filed after the

7   Defendant's Answer.  Defendant also disputes that its Motion for Voluntary Remand is inconsistent with

8   the Court's Scheduling Order.  Defendant contends that reversal with full payment of benefits is not

9   appropriate in this case because further administrative proceedings are required for proper resolution of the

10  factual issues.  Specifically, the Defendant argues the administrative law judge did not evaluate whether

11  Johnson's migraines, chronic pain syndrome, somatoform disorder, and myofascial pain syndrome were

12  severe at step two of the sequential evaluation procedure.  Defendant also asks that the Court remand this

13  case for the ALJ to consider the opinions of Dr. Schorn, an independent medical expert called by the ALJ,

14  and Dr. David Roth, one of Plaintiff's treating physicians.  Defendant argues that the "crediting as true"

15  doctrine is not mandatory in the Ninth Circuit, and that payment of benefits should be awarded only in the

16  most unusual case where it is clear from the record that a claimant cannot work.

17          Defendant acknowledges that Dr. Schorn testified that Plaintiff's mental limitations would prevent

18  her from working full time.  However, Defendant claims that this opinion was contradicted by the opinion

19  of Miles S. Morgan, who examined the Plaintiff earlier.  Thus, the case should be remanded to allow the ALJ

20  to resolve the inconsistencies between the opinions of Dr. Morgan and Dr. Schorn.  Remand is also

21  appropriate to address the opinions of Dr. Roth, one of Plaintiff's treating physicians in Massachusetts, who

22  opined Plaintiff was disabled and recommended that she move to the southwest where a warmer, dryer

23  climate would alleviate her pain.  After Plaintiff moved, Dr. Roth no longer treated her.  Plaintiff was treated

24  by Las Vegas Physician, Michael McKenna.  Defendant concedes that the ALJ's analysis of the medical

25  opinion evidence was inadequate but argues the inadequacy of her analysis does not support a payment of

26  benefits.

27  ///

28  ///

1          **5.      Plaintiff's Motion to Strike.**

2          Plaintiff filed a Motion to Strike Defendant's Reply to Plaintiff's Response pursuant to Federal Rule

3   of Civil Procedure 12(f) characterizing it as a "reply to a reply" which is not authorized by the Social

4   Security Act, the Rules of Civil Procedure or the Court's Scheduling Order.  The Motion to Strike also

5   contends that the ALJ's decision must stand or fall on its own merit and appellate counsel is not entitled to

6   "post hac rationalization for the agency's action".  Finally, Plaintiff contends that adopting the agency's

7   position would render this Court's Scheduling Order meaningless and that the Defendant is improperly

8   attempting to get in the last word when the right to open and close argument belongs to the party who has

9   the burden of proof or affirmative duty to establish a fact or proposition.

10          **6.      Defendant's Response to Plaintiff's Motion to Strike.**

11          Not to be outdone, Defendant filed a Response to Plaintiff's Motion to Strike arguing that Motions

12   to Strike are disfavored and should not be granted unless it is clear that the matter to be stricken could have

13   no possible bearing on the subject matter of the litigation.

14   **III.   <u>Analysis and Findings</u>**

15          Reviewing the record as a whole, weighing both the evidence that supports and the evidence that

16   detracts from the ALJ's conclusion, the court finds the ALJ's decision is not supported by substantial

17   evidence and that the ALJ committed legal error.  The court finds that the ALJ cited selective portions of

18   the medical record supporting denial of disability benefits and completely ignored whole categories of

19   records and opinions of Plaintiff's treating physicians.  The Defendant concedes, and the court finds, that

20   the ALJ did not adequately analyze the medical evidence in the record and did not evaluate Johnson's

21   diagnosed migraines, chronic pain syndrome, somatoform disorder and myofascial pain syndrome, or

22   determine whether these impairments are severe and what limitations are caused by these impairments or

23   combination of impairments.  The Defendant also concedes, and the court finds, that the ALJ failed to

24   consider the opinions of Dr. Schorn, the independent medical expert the ALJ herself called, and Dr. David

25   Roth, one of Plaintiff's treating physicians who has opined Plaintiff has been permanently and totally

26   disabled since October 27, 1997.  The court also finds the ALJ improperly rejected Plaintiff's subjective

27   disabling pain complaints, and committed a number of other legal errors.  The following is an illustrative,

28   but my no means exhaustive list of those errors.

First, as the Defendant concedes, the ALJ failed to consider or evaluate large portions of the medical evidence in the record indicating Plaintiff has been diagnosed with migraines, chronic pain syndrome, somatoform disorder and myofascial pain syndrome.  Again, as the Defendant concedes, the ALJ failed to determine whether these impairments, in combination with the severe impairments the ALJ had already found, significantly limited Johnson from performing basic work activities.

Second, the ALJ made a finding at Step Three of the sequential evaluation process that Johnson's impairments did not meet or equal any of the impairments of the Listings.  In making this finding she both relied upon and disregarded the opinions of Dr. Schorn, an independent medical examiner she called to provide medical opinion testimony based on his review of the Plaintiff's medical history.  On page two of her opinion she states that Dr. Schorn "testified at the hearing that the claimant's impairment is not of a severity to meet or equal any listed impairment."  (A.R. 30).  However, on page four of her decision, she states:

> Dr. Schorn testified that there is little objective evidence to support any of the claimant's disabling conditions.  Dr. Schorn further testified that if you believe all of her pain and suffering really exists, then a somatoform listing would be met.  However, Dr. Schorn's function at the hearing was to opine on the medical evidence of record, which he did, not evaluate the claimants demeanor.  For this reason, I accept only his testimony with respect to the contents of the medical evidence.

(A.R. 32)(emphasis in original).

The court has carefully reviewed Dr. Schorn's testimony.  Dr. Schorn summarized his review of the Plaintiff's medical history, complaints, treatment and surgery.  He testified that from his review of the medical records he understood the Plaintiff had been involved in at least four automobile accidents beginning in 1994.  Work up revealed that she had a C6 nerve root lesion on the right side and that her symptoms fit this diagnosis.  She also had an anterior cervical dissectomy and fusion at C5-6 on May 4, 1995, continued to be symptomatic and was treated symptomatically.

He testified that in August 1998, Johnson was involved in another automobile accident which aggravated her neck and gave her additional problems in her low back and left leg.  During this time she was also found to have a liver lesion which was asymptomatic.  Lymphedema was diagnosed which created further problems with both of her lower extremities and her feet and she was diagnosed with problems in her right shoulder.  An MRI scan of the right shoulder revealed a fracture with an avulsion of the glanoid

1  tuberocity and a significant tear of her rotator cuff on the right side. This resulted in surgery and repair and

2  apparently continued to cause her pain. Dr. Schorn's review of the record revealed that "she has actually

3  generalized pain that seems to involve almost every part of her body." Dr. Schorn did testify, as the ALJ

4  stated, that Johnson did not have much in the way of objective findings. However, Dr. Schorn pointed out

5  that Johnson was recently seen by a neurosurgeon "showing some positive findings, primarily a positive

6  straight-leg raising test on the left side."

7      Although acknowledging there was not much in the way of objective findings, Dr. Schorn plainly

8  testified, "I think what she has is a chronic pain syndrome." He opined that there were certainly objective

9  findings in Johnson's past indicating that she had organic injuries. He reiterated that she had four

10  automobile accidents--in 1994, 1998, 2003 and 2005. He also testified that based on his own evaluation,

11  Johnson's symptoms were real. He testified:

12      I feel that her symptoms are real; . . . I feel that **she has a chronic pain syndrome which I
      think would equal the somatoform disorder**. And when I say somatoform, I don't think
13      the symptoms are somatoform, but I think the syndrome equals a somatoform disorder where
      she has significant pain but–that has caused her to see a physician frequently. It has certainly
14      altered her life patterns, and it has significantly interfered with her movement and ability to
      function. And I think that it has resulted in at least marked . . . or moderate restrictions of
15      her activities of daily living . . . moderate to marked difficulties in social functioning. . . .
      more difficulties in maintaining concentration, persistence, and pace, **and she has had
16      repeated episodes of decompensation when she attempted to return to work**. It's my
      opinion also that **even if she were able to obtain a position, I doubt that if she could
17      fulfill the required eight-hour day or forty-hour work week**.

18  (A.R. 625-626)(emphasis supplied).

19      The ALJ questioned Dr. Schorn about these findings and asked what limb he was referring to under

20  Listing "(a)(2)(d)". Dr. Schorn responded that he was referring primarily to Johnson's right arm and her left

21  leg, and that Johnson also had problems with sensory loss. The ALJ specifically asked Dr. Schorn whether

22  he was basing these opinions on information preceding the date last insured, or whether he was "considering

23  her testimony about how she is now and the more recent medical records?" (A.R. 627). Dr. Schorn

24  responded "no, I am not. Primarily based on the record that I have, Your Honor, that precedes the

25  expiration of date of 2004 (sic)." Id.

26      As indicated, the ALJ's decision rejected Dr. Schorn's testimony that Johnson suffered from a

27  somatoform disorder because his "function at the hearing was to opine on the medical evidence of record,

28  which he did, not evaluate the claimant's demeanor." (A.R. 32). However, it is clear from Dr. Schorn's

testimony that he based his opinion on his medical review of the record as a whole preceding Johnson's date last insured– March 31, 2004. He specifically and unequivocally testified that he did not base these opinions on her testimony at the hearing and the more recent medical records. Dr. Schorn reiterated his testimony that the Plaintiff suffered from a chronic-type of pain syndrome that equals a somatoform disorder. He concluded:

> It really boils down to whether I believe whether she's having symptoms or not. I tend to believe that these are real to her, and have caused significant limitation in her lifestyle and her ability to function as she would like.

Id.

The court finds the ALJ erred in rejecting Dr. Schorn's testimony that the Plaintiff suffers from a somatoform disorder, which equals an impairment in the Listing. She rejected his opinion because his function was to opine on the medical evidence of record, not evaluate the claimant's demeanor. However, his testimony is clear that he based his opinions on the medical record and was **not** basing his opinions on Johnson's hearing testimony. Nothing in the record supports even a suggestion that he was basing his opinions on Johnson's demeanor during the hearing. Dr. Schorn's uncontradicted finding that Johnson suffers a medical impairment that equals a Listing conclusively establishes disability. The ALJ committed clear error in concluding in one portion of her opinion that Dr. Schorn opined Johnson's impairment is not of a severity to meet or equal any listed impairment. Nothing in the record supports this finding. She also erred in rejecting his testimony that Johnson suffers from a somatoform disorder which equals an impairment in the Listing.

Third, the ALJ committed legal error in finding that the administrative record did not support a finding of episodes of decompensation. Dr. Schorn testified that Johnson has had repeated episodes of decompensation when she attempted to return to work. The administrative record supports the opposite finding. Johnson experienced repeated episodes of decompensation when she attempted to return to work.

Fourth, the ALJ committed legal error in finding that no treating or examining physician has opined that Johnson is totally and permanently disabled from all work. The ALJ made a passing reference to Dr. Roth's April 14, 2003 report indicating that he had been treating the claimant since 1995 for a herniated disc for which she underwent surgery and chronic degenerative lumbar disease. However, inexplicably she completely ignored Dr. Roth's July 21, 2004, May 10, 2006 and September 5, 2006 written opinions that

1   Johnson became totally and permanently disabled beginning on October 27, 1997.  (A.R. 202, 540).  Dr.

2   Roth diagnosed Plaintiff with "(a) herniated cervical disc followed by cervical fusion and residual permanent

3   nerve damage; (b) fibromyalgia; (c) myofascial pain syndrome; (d) lumbar discogenic degenerative disease

4   with pain; (e) L5-S1 disc herniation; (f) osteoporosis in the hips, spine, and forearm."

5   (A.R. 541).  As a result of  these diagnoses, Dr. Roth concluded Johnson was totally and permanently

6   disabled for any kind of employment.  (A.R. 541).

7           The implementing regulations for Title II of the Social Security Act distinguish among the opinions

8   of three types of physicians: first, treating physicians; second, examining physicians (*i.e.* physicians who

9   examine but do not treat a claimant); and third, non-examining or reviewing physicians (*i.e.* physicians who

10  neither examine nor treat the claimant, but review the claimant's file).  Lester v. Chater, 81 F.3d, 821, 830

11  (9th Circuit 1995); 20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more

12  weight than an examining physician's, and an examining physician's opinion is entitled to more weight than

13  a reviewing physician's.  Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).  The social security regulations

14  give more weight to opinions that are explained than those that are not.  20 C.F.R. § 404.1527(d)(3).  The

15  social security regulations also give more weight to opinions of specialists concerning matters relating to

16  their specialty over that of non-specialists.  20 C.F.R. § 404.1527(d)(5).

17          In disability benefits cases, physicians typically provide medical opinions that address the nature and

18  extent of the claimant's limitations, and opinions concerning "the ultimate issue of disability", *i.e.* opinions

19  about whether a patient is capable of any work given her limitations.  Holohan v. Massanari, 246 F.3d 1195,

20  1202 (9th Cir. 2001).  "Under the regulations, if a treating physician's medical opinion is supported by

21  medically accepted diagnostic techniques that is not inconsistent with other substantial evidence in the

22  record, the treating physician's opinion is given controlling weight."  Id, (citing 20 C.F.R. § 404.1527(d)(2)

23  and Social Security Ruling 96-2p).  To reject the uncontradicted medical opinion of a treating physician, an

24  ALJ must provide "clear and convincing" reasons supported by substantial evidence in the record.  Id, (citing

25  Reddick v. Chater, 157 F.3d, 715, 725 (9th Cir. 1998)).  Treating source medical opinions are entitled to

26  deference even if inconsistent with the substantial evidence in the record and treating physician's medical

27  opinions must be weighted using all of the factors provided in 20 C.F.R. § 404.1527.  Id, (citing SSR 96-2p).

28  "An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of the

1    treating doctor only if she or he provide 'specific and legitimate' reasons supported by substantial evidence

2    in the record." Id, (citing Lester, 81 F.3d at 830).  Similarly, and ALJ may not reject a treating physician's

3    uncontradicted opinion on the ultimate issue of disability unless there are "clear and convincing" reasons

4    supported by substantial evidence in the record.  Id.  Even if the treating physician's opinion on the issue

5    of disability is controverted, the ALJ must provide "specific and legitimate" reasons to reject a treating

6    physician's opinion.  Id.

7          In this case, the ALJ did not even discuss the opinion of Plaintiff's treating physician, Dr. Roth, that

8    Johnson became totally and permanently disabled beginning October 27, 1997 for reasons he detailed in his

9    reports dated July 21, 2004, May 10, 2006, and September 5, 2006.  Each of these reports were in the

10   Administrative Record, but completely ignored by the ALJ.  The ALJ did not provide any reasons, let alone

11   clear and convincing reasons for rejecting Dr. Roth's conclusion that Johnson has been totally and

12   permanently disabled for any kind of employment since October 27, 1997.

13         Fifth, the court finds the ALJ improperly rejected Johnson's subjective complaints of incapacitating

14   fatigue and pain.  The ALJ found that Johnson retained the residual functional capacity to perform her past

15   relevant work as a reservation clerk and was therefore not disabled.  In assessing Johnson's residual

16   functional capacity, the ALJ considered Johnson's claims of disabling pain and functional limitations and

17   found by clear and convincing evidence that Johnson's subjective allegations were not fully credible.  The

18   court finds the ALJ erred and that her findings were not supported by clear and convincing evidence.

19         In the Ninth Circuit, once a claimant produces objective medical evidence establishing an impairment

20   that could reasonably be expected to cause **some** pain, an ALJ may not discredit the claimant's allegations

21   of the severity of the pain solely on the ground that the allegations are unsupported by objective medical

22   evidence. Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986)(per curiam). The Ninth Circuit recognizes

23   that "unlike most medical conditions capable of supporting a finding of disability, pain cannot be objectively

24   verified or measured." Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).  The existence and degree of pain

25   "is a completely subjective phenomenon." Id.  Because of this, "it is possible to suffer disabling pain even

26   where the *degree* of pain as opposed to the mere *existence* of pain, is unsupported by objective medical

27   findings." Id (emphasis in original).  This type of pain is typically referred to in the cases as "excess pain".

28   Id.  Definitionally, excess pain is "at a level above that supported by medical findings".  Id.  It is improper

-31-

as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings because permitting an ALJ to disbelieve pain testimony solely on this ground would permit denial of benefits to claimants whose pain, in fact, prevents them from working. Id at 601-602.

In this case, it is undisputed that Johnson has a variety of medical impairments that can be expected to cause pain. Thus, the ALJ could not simply reject Johnson's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of her pain. "In order to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that decision." Fair v. Bowen, 885 at 602. Such findings discrediting a claim of excess pain "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a claimant's testimony regarding pain.'" Bunnell v. Sullivan, 947 F.3d 341, 345-345 (9th Cir, 1991).

Social Security Ruling 88-13 was implemented to assist ALJs in making the required findings. Id at 346. Once a claimant establishes a medical impairment reasonably likely to cause pain, SSR 88-13 requires the ALJ to consider "all of the available evidence" because "pain is subjective and not susceptible to measurement by reliable techniques." Id, (citing SSR 88-13). A number of the reasons given by the ALJ for finding Johnson's subjective allegations not fully credible are plainly wrong. For example, she found Dr. Schorn testified there is little objective evidence to support any of the claimant's disabling conditions. Dr. Schorn in fact testified that Johnson suffered from a number of disabling conditions, that her combination of impairments equaled the somatoform disorder and that he believed Johnson was incapable of working.

The ALJ also found that Johnson's treatment "has been relatively conservative." However, Johnson has undergone multiple surgical procedures over the years. She was involved in her first automobile accident May 5, 1994. After a year of physical therapy, pain medication and multiple visits to multiple specialists for treatments, she underwent a cervical analgesic diskography on March 15, 1995 and an anterior cervical micro diskectomy at C5-6 on May 4, 1995. Before undergoing the diskectomy and fusion, she saw multiple physicians. In an office visit with Dr. Jules Nazarro on October 20, 1994, Johnson told Dr. Nazarro she felt she had exhausted conservative measures to treat her and asked to be evaluated by an outside

-32-

neurosurgeon.  She was.  However, Dr. Nazarro recommended against surgical intervention.  Dr. Fullerton and Johnson's physical therapist thought she should be considered for surgery in September 1994, and Johnson was referred to a microsurgeon, Dr. McCann, on October 12, 1994.  Dr. Roth ultimately performed the surgery May 4, 1995 after analgesic injections proved ineffective in eliminating her pain.

Johnson's medical records are replete with references to diagnosis and treatment for chronic pain.  She has been diagnosed with chronic pain by multiple treating physicians, and treated by three chronic pain specialists.  She treated with Dr. Popovich, a pain manage specialist beginning in November 1995 through June 11, 1997.  Dr. Popovich diagnosed Johnson with status post surgical decompression of C6 nerve root and myofascial pain syndrome with trigger points.  Dr. Popovich administered lidocaine injections, prescribed additional physical therapy treatment, and prescribed a variety of medications to treat Johnson's pain.  In the spring of 1996, Johnson was diagnosed by Dr. Tad S. Davis with major depressive disorder and chronic pain syndrome resulting from her inability to control and manage the pain in her back.  Dr. Davis recommended that Johnson participate in an intensive chronic pain management program.  However, Johnson had exhausted her rehabilitation benefits and could not afford the recommended treatment.

The ALJ also discredited Johnson's claim of disabling pain on the grounds "no treating or examining physician had opined that the claimant is totally and permanently disabled from all work."  For the reasons discussed in detail, *infra*,  this finding is clearly erroneous.

The ALJ also found, that the claimant was able to participate in the administrative hearing and respond to questioning without any apparent difficulties in support of her finding, Johnson was not credible.  However, in the Ninth Circuit the fact that a claimant does not exhibit manifestations of pain at the hearing before the ALJ is, of itself, insufficient to rebut a claim of pain.  Fair v. Bowen, 885 F.2d at 602.

The ALJ found Johnson lacked credibility because her statement contradicted her testimony that "she does not drive but yet drives the kids".  Her testimony at the hearing was that she drives two or three times a week to take her son to school or run to the drugstore at the end of the street or to the grocery store.  (A.R, 605).  She testified that she only drives occasionally because the medication she takes makes it unsafe for her to drive a car and she has numbness and pain in her lower back and onto her legs.  Id.

The ALJ also discredited her testimony concerning disabling pain and functional limitations because Johnson's activities of daily living "are not limited to the extent one would expect" and because she "is

apparently able to care for young children at home . . . with only some assistance." It is unclear, because there are no findings, what activities of daily living the ALJ found were inconsistent with her complaints of disabling symptoms and limitations. Johnson testified that a girlfriend and her husband do most of the grocery shopping. Id at 617. Johnson has a housekeeper who does all of the household chores including the dishes. Johnson's husband does the cooking, although Johnson uses the microwave. Id. Johnson usually gets out of bed at 6:30 a.m. or 7:00 a.m. and goes to bed between 9:00 p.m. and 9:30 p.m. Id at 616. She estimated that she sleeps approximately three hours a night and gets up throughout the night. Id. She takes pain medication before she goes to bed and additional pain medication in the middle of the night. Id. She naps three to four times throughout the day between forty-five minutes and two hours at a time. Id at 616-617. She tries to swim in the pool and do exercises. Id at 618. She sits and interacts with her children and watches them play and "that's pretty much it." She occasionally accompanies her husband and children to watch her children bowl. Id. However, while the children bowl a couple of games, she has to get up and move and go and sit in different spots. Id. She is unable to bathe and, therefore, takes showers. Id. It is difficult for her to wash her hair. Id at 619. It is difficult for her to wash her legs and she does not shower everyday. Id. She has difficulty putting on bras and sports bras and slips her shoes on without tying them. Id at 619.

Her children were eight and four at the time of the hearing. Id at 621. When asked who takes care of her children, Johnson responded that her husband is home a lot and that a friend down the street helps her. Id. Her husband works evenings and midnight shifts. She car pools with a neighbor and another group and sometimes drives her children to school. Id. Aside from watching the family bowling, Johnson's other activities consist of watching her kids play on their bikes or play baseball or football. Id. The family occasionally goes out to dinner or her husband will bring food home.

Limitations of time, space and resources prevent the court from detailing all of the ALJ's findings that are not supported by substantial evidence in the record. Suffice it to say, the ALJ's findings that Johnson's activities of daily living and apparent ability to take care of her small children indicate she is not disabled by pain are not supported by substantial evidence in the record. There is ample subjective and supporting objective clinical evidence of Johnson's disabling pain in the record which the ALJ ignored entirely or rejected. Viewing the record as a whole, it is clear that multiple treating physicians who have

examined and treated Johnson over the years have concluded that Johnson suffers from a variety of conditions that cause her constant pain.

Sixth, the testimony of Mr. Cummings, the vocational expert called by the ALJ, also does not constitute substantial evidence to support the ALJ's findings.  The ALJ asked two hypothetical questions which were not supported by the medical evidence in the record.  First, Mr. Cummings was asked to assume that Johnson suffered from a mild limitation in sustaining attention toward the end of the day and was capable of sedentary work.  Based on the this hypothetical, Mr. Cummings testified she would be capable of performing her past work as a reservation agent.  The second hypothetical posed was to assume Johnson was capable of sedentary, simple, repetitive tasks with little contact with the public or co-workers.  Cummings opined that Johnson could work as an inspector or assembler.  (A.R. 632-633).  However, Johnson's attorney asked Mr. Cummings if a person who couldn't work eight hours a day, five days a week without frequent breaks for rest, taking pain medication, and needing naps, could do these jobs.  Mr. Cummings responded, "Yes, it would suggest to me that the person would not have the capacity to perform full-time work."  Id at 333.  Here the ALJ did not ask the vocational expert hypotheticals which set forth all of Johnson's impairments.  Additionally, when cross-examined by Johnson's attorney, Mr. Cummings testified that a person who could not work eight hours a day, five days a week, and who needed to take frequent breaks for rest, pain medication, and who needed to nap would not have the capacity to perform full-time work.

"If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the 'expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.'"  Matthews v. Shalala, 10 F.3d 678, 681, (citing DeLorne v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  The vocational expert's testimony in this case did not reflect the evidence of Johnson's medical and functional impairments.  In fact, the vocational expert's testimony taken as a whole strengthens Johnson's disability claim.  Accordingly, the ALJ's conclusion that Johnson could engage in substantial gainful activity is not supported by substantial evidence.

As indicated, these are merely six examples of the errors made by the ALJ in this case.  As the ALJ's decision is not supported by substantial evidence and contains reversible error, remand is required.

///

1    **IV.    Remand**

2           After finding that the ALJ erred, this court has discretion to remand for further proceedings and

3    additional evidence or for an award of benefits.  Harmon v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).  The

4    decision whether to remand for further proceedings or for an award of benefits is within the court's

5    discretion.  Reddick v. Chater, 157 F.3d 715, 728 (9th Cir. 1998).

6            Sentence four and sentence six of 42 U.S.C. § 405(g) set forth the exclusive methods by which

7    district courts may remand to the Commissioner of the SSA.  Shalala v. Schaefer, 509 U.S. 292, 296 (1993);

8    Melkonyan v. Sullivan, 501 U.S. 89, 99-100 (1991).

9           Sentence four provides that "[t]he [district] court shall have power to enter, upon the pleadings and

10   transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

11   Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The fourth

12   sentence directs the entry of a final, appealable judgment and provides that a district court may enter

13   judgment with or without remanding the case for a rehearing.  Sullivan v. Finkelstein, 496 U.S. 617, 629

14   (1990).  In a sentence four remand, the court determines whether the ALJ properly considered the claimant's

15   application for benefits.  Melkonyan, 501 U.S. at 100.

16          Under sentence six, by contrast, the court may remand without making a determination concerning

17   the correctness of the ALJ's decision.  Id at 100.  Remand under sentence six is "an entirely different kind

18   of remand.  The district court does not affirm, modify, or reverse the Secretary's decision; it does not rule

19   in any way as to the correctness of the administrative determination." Id at 98 (quoting Finkelstein, 496 U.S.

20   at 626).  The Supreme Court has held that sentence six remands may be issued only in two situations: "where

21   the Secretary [Commissioner] requests a remand before answering the Complaint, or where new, material

22   evidence is adduced that was for good cause, not presented before the agency."  Shalala v. Schaefer, 509

23   U.S. at 292, 297 n.2 (1993).

24          Under a sentence six remand, the Secretary must return to the district court after remand to file any

25   additional or modified findings of fact and decision, as well as a transcript of the additional record and

26   testimony upon which the Commissioner's action in modifying or affirming was based.  42 U.S.C. § 405(g);

27   Melkonyan, 501 U.S. at 98.  The district court, therefore, retains jurisdiction over the matter in a remand

28   ///

-36-

1   under sentence six of 42 U.S.C. § 405(g) and issues a final judgment after the Secretary returns to the court

2   with his additional or modified findings.  Melkonyan, 501 U.S. at 103.

3        The Ninth Circuit has "repeatedly held that a remand for further proceedings is unnecessary if the

4   record is fully developed and it is clear from the record that the ALJ would be required to award benefits."

5   Holohan v. Massanari, 246 F.3d 1195 (9th Cir. 2001)(collecting cases).  The Ninth Circuit adopted this rule

6   because it recognized the importance of expediting disability claims.  Id.  The Ninth Circuit has also

7   recognized that where " it is evident from the record that benefits should be awarded, remanding for further

8   proceedings would needlessly delay effectuating the primary purpose of the Social Security Act, 'to give

9   financial assistance to disabled persons because they are without the ability to sustain themselves.'" Id,

10  (citing Gamble v. Chater, 68 F.3d 319, 322 (9th Cir. 1995)(internal quotation marks and citation omitted).

11       In Lester v. Chater, the Ninth Circuit held that when an ALJ fails to provide adequate reasons for

12  rejecting the opinion of a treating or examining physician, the court may credit that opinion as a matter of

13  law. 81 F.3d 821, 834 (9th Cir. 1995).  In Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996), the Ninth Circuit

14  expanded the credit as a matter of law rule, and developed a three-part test for determining when evidence

15  should be credited and an immediate award of benefits directed.  Improperly rejected evidence should be

16  credited as true and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally

17  sufficient reasons for rejecting such evidence, (2) where there are no outstanding issues that must be resolved

18  before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be

19  required to find the claimant disabled or such evidence credited."  Harmon, 211 F.3d at 1178, (citing

20  Smolen, 80 F.3d at 1292).  Where it is not clear the ALJ would be required to award benefits were the

21  improperly rejected evidence credited, the court has discretion whether to credit the evidence.  Connett v.

22  Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).

23       The court finds this case must clearly be remanded for immediate payment of benefits.  Because the

24  ALJ failed to address, let alone provide adequate reasons for rejecting Dr. Roth's opinion that Johnson has

25  been totally and permanently disabled since October 27, 1997, the court credits his opinion as a matter of

26  law.  An examination of the record as a whole reveals ample support for Johnson's subjective complaints

27  of disabling pain and functional limitations.  The ALJ's own medical examiner testified that Johnson suffers

28  from a somatoform disorder which equals a Listing impairment.  The ALJ improperly rejected his testimony

on grounds not supported in the record.  The Commissioner concedes that the ALJ failed to evaluate Johnson's diagnosed migraines, chronic pain syndrome, somatoform disorder and myofascial pain syndrome. The Commissioner concedes the ALJ failed to determine whether these conditions are severe and what limitations they cause.  Finally, the Commissioner concedes the ALJ failed to consider the opinions of her own consultant and asks that the court remand under Sentence Four to consider his opinions as well as the opinions of Dr. Roth, Plaintiff's treating physician, that Plaintiff is permanently and totally disabled. Remanding this case for further proceedings would needlessly delay the primary purpose of the Social Security Act, to provide financial assistance to disabled persons because they lack the ability to sustain themselves.

For all of the foregoing reasons, **IT IS RECOMMENDED** that:

1.      Johnston's Motion to Remand and Reverse  (Dkt. #20) be **GRANTED**, and the ALJ's decision reversed and this case **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for the calculation and award of benefits, and **JUDGMENT** be entered in Johnson's favor.

2.      The Commissioner's Motion to Remand (Dkt. #25) be **DENIED**.

3.      Johnson's Motion to Strike (Dkt. #28) be **DENIED**.

Dated this 28th day of April, 2010.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE